617 A.2d 238

IN THE MATTER OF MATTHEW E. SEGAL,
AN ATTORNEY AT LAW.

Argued September 29, 1992—Decided December 31, 1992.

*John J. Janasie,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Matthew E. Segal* argued the cause *pro se.*

## ORDER

MATTHEW E. SEGAL of CHERRY HILL, who was admitted to the bar of this State in 1978, having been ordered to show cause why he should not be disbarred or otherwise disciplined, and the Court having considered the arguments of the parties and having conducted an independent review of the record in this matter, and good cause appearing;

It is ORDERED that MATTHEW E. SEGAL is hereby publicly reprimanded; and it is further

ORDERED that the entire record of this matter be made a permanent part of respondent's file as an attorney at law of this State; and it is further

ORDERED that respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs incurred in the prosecution of this matter.

### PER CURIAM.

This disciplinary proceeding arose from a complaint against respondent, Matthew E. Segal. The District Ethics Committee (DEC) summarized the allegations against respondent:

That during the relevant periods of 1989, respondent was engaged as Municipal Court Prosecutor for the Township of Cherry Hill.

That while so engaged, respondent's conduct in the preparation, handling and presentation of a matter entitled *State vs. Barry M. Weinberg,* which involved a charge of "allowing an unsafe vehicle to be operated" in violation of *N.J.S.A.* 39:3–44 constituted gross negligence on the part of respondent in violation of *R.P.C.* 1.1(a).

That respondent did not act with due diligence in the preparation, handling and presentation of this matter in violation of *R.P.C.* 1.3.

Concluding that respondent's conduct had violated *RPC* 1.1(a) and 1.3, the DEC recommended public discipline. On review, the Disciplinary Review Board (DRB), with one member dis-

senting, determined that the evidence did not clearly and convincingly establish that respondent's conduct had violated the *Rules of Professional Conduct.* The DRB recommended dismissal of the complaint.

## I

The underlying facts are complex and tragic. In February 1989, an automobile owned by Superior Court Judge Barry Weinberg and operated by his son, Dr. Howard Weinberg, struck and killed John Stein, the son of a Cherry Hill police lieutenant, and severely injured his companion, Marni Bellovin. Although driving at night, Dr. Weinberg apparently had been operating the vehicle without working headlights. The record before the DEC established that Judge Weinberg had been following his son in a different car and that the car driven by Dr. Weinberg had failed inspection several months earlier. Investigation of the accident and related events resulted in a complaint against Judge Weinberg, charging him with allowing an unsafe vehicle to be operated, contrary to *N.J.S.A.* 39:3–44. Dr. Weinberg was indicted for death by auto. Prior to trial on the death-by-auto indictment, Dr. Weinberg was admitted to Pretrial Intervention. See *Rule* 3:28. Dr. Weinberg was also charged with several traffic violations, to which he ultimately pleaded guilty, resulting in fines of $250.

The charges against Judge Weinberg were scheduled initially to be heard in the Cherry Hill Municipal Court on May 3, 1989, but the matter was adjourned. On May 12, 1989, this Court transferred the case to the Superior Court, Law Division, Burlington County. On May 24, 1989, the Camden County Assignment Judge informed the clerk of the Cherry Hill Municipal Court that the *Weinberg* matter had been transferred to the Burlington County Assignment Judge. On June 21, 1989, the Burlington County Assignment Judge informed respondent and Judge Weinberg's attorney that trial of the matter would take place on July 19, 1989, at 9:00 a.m., and instructed both parties

to communicate with the court promptly if unable to proceed on that date. On June 27, 1989, Judge Weinberg's attorney notified the trial court and respondent that the scheduled trial date was acceptable. Respondent did not reply to the letter from the trial court. Respondent testified before the DEC that when he first received the letter, he believed the matter was an ordinary traffic violation:

> I assumed that I was going to be handling this case at the initial time that I got this letter but I also assumed that it was a run-of-the-mill-traffic case, the only difference being that it involved a Supreme [sic] Court judge and that I would have to prosecute it in the same fashion I had prosecuted all the other cases that I had prosecuted over the years and I would go to court and if there were witnesses to be subpoenaed they would be there. I would go over with them whatever the testimony was and prosecute the—present the prosecution on behalf of the State, that's how it works in municipal court.

Respondent did not interview witnesses or arrange for their subpoenas prior to the designated trial date, nor did he take any steps to prepare for trial. The record before the DEC revealed that there had been twelve witnesses to the accident, three of whom had given sworn statements to the Cherry Hill Police Department indicating that Dr. Weinberg's vehicle had been driven without functioning headlights at the time of the accident.

Respondent testified that it was not until early July that he became aware of the facts underlying the charge against Judge Weinberg:

> I do not recall precisely when I learned in July that the Barry Weinberg case was an outgrowth of the Howard Weinberg case. In fact, I didn't know about the Howard Weinberg case. I know that and I know this subsequently because I have seen copies of newspaper clips that there were newspaper stories about the death of Lieutenant Stein's son.
>
> At the time that I received the letter from [the judge] in June of 1989 and up until the time when I learned of all the surrounding * * * facts of this case, it was not part of my common knowledge that there had been an automobile accident involving the son of a Supreme [sic] Court judge and the son of a Cherry Hill police officer.
>
> \*  \*  \*  \*  \*  \*  \*  \*
>
> I may have heard something about an accident in that vicinity but the fact of Judge Weinberg's son and Lieutenant Stein's son were only learned by me sometime in July.

Respondent testified that when he had learned about the fatal accident, he had assumed that either the county prosecutor or the Attorney General would prosecute the case. Deputy Attorney General John Wynne had presented evidence to the grand jury that had indicted Dr. Weinberg for death by auto.

The evidence regarding respondent's efforts to verify that he would not be responsible for prosecuting Judge Weinberg is conflicting. During argument of the motion for adjournment prior to trial of the *Weinberg* matter, on July 19, 1989, the following colloquy occurred:

> Mr. Segal: I thought that I would have an opportunity over the past couple of weeks to talk to the attorney general. I finally got a call—
>
> . The Court: Well, surely there was such an opportunity?
>
> Mr. Segal: Excuse me?
>
> The Court: Surely there was such an opportunity?
>
> Mr. Segal: Well, I didn't get a call back from the attorney general who had been on vacation until late last week. And he had a—he had gotten back home and was trying to explain a very complex case to me in a short period of time from his backyard. He had been on vacation. That is the person who had handled the bulk of this.

However, respondent acknowledged before the DEC "that the transcript says I had been trying to reach him for a couple of weeks and that is not my position, it was more like a couple of days." In describing to the DEC the events that had transpired, respondent testified:

> . In July culminating in my calling the deputy county prosecutor and ultimately being able to speak to Mr. Wynne. Now, I believe that I had indeed contacted Mr. Wynne sometime after the first 10 days of July and that his call was returned to me but I'm not saying it was a couple of weeks, I'm saying it was like the 11th, 12th, 13th, culminating in a call from him on the 14th.

Deputy Attorney General Wynne, who was in charge of the Howard Weinberg case, also testified before the DEC. He stated that he had been on vacation for only two days, that there had been no letters or calls from respondent at any time that summer, and that he had telephoned respondent on July 14, 1989, on his own initiative.

On July 12, 1989, Sergeant Harty, the sergeant in charge of the traffic-safety unit in the Cherry Hill Police Department,

learned that Judge Weinberg's trial was set for July 19th. Sergeant Harty testified before the DEC that because he had been under the impression that none of the municipal complaints against either Judge or Dr. Weinberg would be heard before the conclusion of the grand jury proceeding on the death-by-auto charge, he had attempted immediately to communicate with Deputy Attorney General Wynne. In his testimony before the DEC, Deputy Attorney General Wynne verified that he had spoken with both Sergeant Harty and respondent on July 14th:

> On Wednesday, July 12, 1989, messages were left at my office to call Assistant Prosecutor Debbie Siegrist of the Burlington County Prosecutor's Office and Sergeant Harty of the Cherry Hill Police Department. Since I had taken vacation days on July 12 and 13 I returned those two calls on the afternoon of Friday, July 14 after I returned home from court. Assistant Prosecutor Siegrist informed me that the municipal court case against Barry Weinberg had been transferred to [ ] the Superior Court sitting in Burlington County and that it was scheduled to be heard and tried on Wednesday, July 19, 1989. I told her that I assumed that the Cherry Hill Municipal Prosecutor would handle that case. She indicated she had received my name from the Cherry Hill Police Department and wanted to notify someone since she was not going to be prosecuting the matter and wanted to make sure someone would be there to do it. I told her that I would speak to both the Police Department and the Municipal Prosecutor. I then called Sergeant Harty who told me he had received the information about the scheduled court appearance from the Assistant Prosecutor in Burlington County on Wednesday, July 12 and to his knowledge no one had been subpoenaed or been notified of this date. I asked Sergeant Harty for the name of the Municipal Court Prosecutor in Cherry Hill and was told that his name was Matt Segal and I was provided with his law office telephone number. I called and spoke to Mr. Segal to inform him of the scheduled court appearance. During our discussion I informed him that I was only handling the Howard Weinberg case and that I assumed that as Cherry Hill Municipal Prosecutor he would be prosecuting the Barry Weinberg case before [the trial court] the following Wednesday. His reply was to the effect of "I guess I am." He did indicate that he had assumed that the Attorney General's Office would be prosecuting the Barry Weinberg case as well as the Howard Weinberg case but did not indicate that he or the Township Prosecutor's Office had any conflicts of interest or any other reason why he could not prosecute the matter. I told him that the police department would make available to him all the reports concerning the entire case and that they would assist him in contacting witnesses, etc. I then called back Sergeant Harty and told him that Mr. Segal would be prosecuting the case [ ] and to provide him full access to all reports and assist him in any way necessary to prepare the case.

On Monday, July 17, 1989, Sergeant Harty called respondent and left a message with his secretary. Respondent returned the call and spoke with Officer Lawer, the investigating officer on the case. He told Officer Lawer that he would be in municipal court on the evening of July 18th and would be available to discuss the *Weinberg* case. No meeting between respondent and the police officers occurred. Respondent testified that he had been in court on the evening of July 18th but that the police officers had not been present. The police officers testified that they reside within a short distance of the municipal complex, and that they had been at home and would have come to court at respondent's request. Respondent did not call the officers nor did he ask the police dispatcher to do so. Although the municipal court clerk had access to the police investigative files, respondent did not request the *Weinberg* file when he was in court on July 18th.

Respondent made no effort either to prepare for trial on July 19th or to inform the trial court of his intention to seek an adjournment. Respondent testified that at the time he had thought he would "be more successful with a personal appearance face to face."

On the morning of July 19th, immediately preceding the scheduled trial, Police Officer Lawer gave respondent the case file. When the case was called, respondent requested an adjournment. He explained to the trial court that because of the complex legal proceedings that had arisen as a result of the car accident, and the involvement of the Attorney General and the county prosecutor, he had assumed that he would not be required to prosecute the charge against Judge Weinberg. Respondent further informed the trial court that material witnesses were not present.[1] The witnesses listed in the police

---

[1] In his opening statement to the DEC, respondent asserted that he had also told the trial court that he should not be forced to prosecute Judge Weinberg because of a conflict of interest. Respondent was, at the time of trial, a freeholder in Camden County. Respondent testified that this statement was

report had not been subpoenaed. The trial court denied respondent's application for adjournment:

This morning is the first time I've heard of any prosecutorial difficulties and they seem to stem from the failure of the State to name or agree upon the prosecutor who would be responsible for the presentation of the case. The State is here with at least one witness, I gather, one of its officers. The defendant is here, both counsel are here. And it seems to me that the application for a postponement comes much too late under those circumstances so that I will require you to go forward, Mr. Segal.

At respondent's request, the trial court granted a ten-minute recess to enable respondent to confer with Officer Lawer. When the trial commenced, respondent called Officer Lawer as a witness. After describing his activity at the scene, Officer Lawer testified concerning the condition of the vehicle involved in the accident:

Well we observed that the—where the pedestrians had been struck. They had gone across the hood of the vehicle, the front portion of the vehicle. This vehicle is equipped with what people call hide-away lights or pop up head lights, whatever you may call them. I observed that the headlight on the driver's side of the vehicle as opposed to being up it appeared that the cover of the headlight was down and something or someone had passed over the hood of the vehicle rubbing the road film or dirt, whatever you want to call it, off of that area. If the headlight had been open the lamp, itself, the gloss and the cover would have been damaged, and this indicated to me that the lights were not in an on mode at the time of impact.

*    *    *    *    *    *    *    *

Well, at the scene when I was waiting for the tow truck I tried to turn the lights on to see if they were working. The lights did come on. The headlights popped up. The driver's side headlight didn't work. The passenger's side headlight and all the other lights on the vehicle worked, however they were very dim, and as you stood there and observed the vehicle the lights decreased in brightness to a point where they actually went out after a period of time.

Officer Lawer had no personal knowledge concerning the condition of the headlights immediately prior to the accident. Nor was he permitted to relate what witnesses had told him about the accident. Officer Lawer also testified that the vehicle had failed inspection a few months before the accident.

---

made in chambers and, therefore, was not reflected in the record of proceedings encompassing respondent's application for an adjournment.

Judge Weinberg's counsel did not cross-examine Officer Lawer. No other witnesses were called.

At trial, no one disputed that Judge Weinberg had owned the vehicle driven by Dr. Weinberg and that Judge Weinberg had been driving directly behind the vehicle operated by his son. Respondent was unable to offer any evidence to show that Dr. Weinberg had been operating the vehicle without headlights prior to and at the time of the accident. After the State rested, Judge Weinberg's counsel moved for a judgment of acquittal, arguing that the State had not sustained its burden of proof. In response to the defense motion, respondent argued that the court could infer, based on Officer Lawer's testimony, that "there was a problem with the car" and that Judge Weinberg knew of the problem. Alternatively, he argued that the vehicle had failed inspection and knowledge of that failure should be imputed to the owner:

> So coupled with the other circumstantial evidence you have the concrete evidence of a car that failed inspection that did not belong on the roadway and, therefore, should not have been permitted to be on the roadway.

The trial court denied the motion for acquittal. The defense then offered into evidence a copy of a summons issued to Dr. Weinberg for failure to have a motor vehicle inspected. The summons apparently was offered to show that a determination had been made that Dr. Weinberg was in control of the vehicle involved in the accident, in order to rebut the State's contention that Judge Weinberg had been aware that the vehicle was in an unsafe condition. The defense then rested and renewed its motion for judgment of acquittal. The trial court concluded that the State had not proved the elements of the offense beyond a reasonable doubt and entered a judgment of acquittal.

Shortly thereafter, the DEC filed a formal complaint against respondent alleging that respondent's failure to prepare for the July 19, 1989, trial constituted gross neglect and failure to act with reasonable diligence in violation of *RPC* 1.1(a) and 1.3. Respondent contends that his failure to prepare adequately for trial resulted from his belief that the charge against Judge

Weinberg was a routine violation. When he learned that the matter was not routine, he assumed that the Attorney General would prosecute Judge Weinberg. Finally, respondent claims that by the time he learned that he would be prosecuting the case, it was too late to prepare for trial, and a request for continuance was the appropriate action to take:

I found myself in a position of at the last minute understanding that this case was much more complex and so I knew that when I went to court on the 19th that I had no alternative but to go and be honest with [the judge] and explain everything to him and I fully anticipated that he would grant me that continuance. As I've said before, I've been prosecuting for 12 years, I haven't been prosecuting for the past couple years but the 10 years prior to that in my 12 years in law, seeking continuances is commonplace and I have not very often but a few times in my career had to go to a judge and explain whatever the circumstances were that we couldn't go on for a particular reason, and I thought that if I went to [the judge] and explained to him what was involved in this case that he would not go forward with this case, that he would grant me the continuance.

I further was of the belief that because in the context of even municipal court cases which move more rapidly than the rest of the judicial system, this wasn't an old case. I believe sometime in March from Officer Lawer's testimony, the charges were preferred or the charge was preferred against Judge Weinberg so the case was less than five months old at the time it was scheduled on July 19. There was one report and answer, that was this one, and there was one witness for the defense and that was Judge Weinberg, the defendant. There were numerous times when both at the request of the State and through the prosecutor, the municipal prosecutor, and defense counsel, that many witnesses are there for both sides and cases are adjourned for one reason or another and while that is an inconvenience to a lot of people, that is something that is routinely done. In this case any inconvenience except to the defendant was born [sic] by the police officers who would gladly have continued this case but [the judge] felt that the motion should be denied. I was shocked and I still am, to me there's no reason why that case had to go forward on that date and I believe as strongly today as I did then that the continuance should have been granted.

## II

The DEC concluded that

the complainant has met its burden in that the conduct of respondent in handling the motor vehicle charge against Judge Weinberg was grossly negligent. The factual pattern established in this matter clearly shows that respon-

dent did little or nothing to prepare this matter for trial from the initiation of the motor vehicle charge.

\*    \*    \*    \*    \*    \*    \*    \*

For the same reasons as stated above the panel unanimously finds that respondent violated *RPC* 1.3. The factual findings made above equally support the charge under *RPC* 1.3 by clear and convincing evidence and the panel finds that respondent did not act with reasonable diligence and promptness in his prosecution of the motor vehicle charge.

The DEC panel recommended a public reprimand.

Although not disputing the factual findings of the DEC, the DRB concluded:

Upon a *de novo* review of the record, the Board does not find the evidence clearly and convincingly establishes that respondent's conduct was unethical. Hence, the Board disagrees with the conclusion of the committee and recommends that the recommendation for public discipline be dismissed.

Although respondent did not pursue the prosecution of Judge Weinberg as prudently as he might have, his misconduct in this matter does not rise to the level of gross neglect and lack of diligence found by the DEC.

The DRB found reasonable respondent's expectation that either the Attorney General or the county prosecutor would prosecute Judge Weinberg. The Board also found that "although respondent should have requested the adjournment far earlier than he did, his failure to do so was not gross neglect." The Board also concluded that respondent had acted reasonably in anticipating that the adjournment would be granted. Ultimately, the DRB found that although "respondent clearly should have handled the prosecution in a different manner, he did not grossly neglect his responsibilities."

## III

*RPC* 1.1(a) provides in part that "[a] lawyer shall not: (a) Handle or neglect a matter entrusted to the lawyer in such manner that the lawyer's conduct constitutes gross negligence." *RPC* 1.3 dictates that "[a] lawyer shall act with reasonable diligence and promptness in representing a client." A violation of the *Rules of Professional Conduct* must be established by clear and convincing proofs. *In re Gross*, 67 *N.J.* 419, 424, 341 *A*.2d 336 (1975). Discipline for violating *RPC*

1.1(a) and 1.3 generally has been imposed where the attorney's conduct injured or prejudiced the interests of a client. *See, e.g., In re Humen,* 123 *N.J.* 289, 586 *A.*2d 237 (1991) (concluding that attorney's failure in real-estate transaction to record deed and mortgage for six years and failure to insist that seller's spouse sign deed constituted gross negligence); *In re Beck,* 118 *N.J.* 561, 573 *A.*2d 147 (1990) (failing to prepare for and notify client of settlement conference violated *RPC* 1.1(a) and 1.3); *In re Yetman,* 113 *N.J.* 556, 552 *A.*2d 121 (1989) (holding that attorney's failure to work actively on administration of estate, to conclude matter within three and one-half years, or to refer matter to another attorney after recognizing matter to be beyond his competence constituted gross negligence and lack of due diligence, in violation of *RPC* 1.1(a) and 1.3).

We first acknowledge that prosecutions in municipal courts differ significantly from prosecutions in the Superior Court; nevertheless, we look to the duties imposed on county prosecutors to provide a framework for our analysis in this disciplinary proceeding. We note further that although respondent was a municipal prosecutor, the prosecution of Judge Weinberg was heard in the Superior Court.

In *State v. Winne,* 12 *N.J.* 152, 96 *A.*2d 63 (1953), reversing an order dismissing an indictment charging a county prosecutor with criminal nonfeasance, we had occasion to consider the duty imposed by law on a prosecutor. We observed:

"[The prosecutor] is the officer upon whom the state relies for the prosecution of all criminal offenses within his jurisdiction. If he fails or refuses to act, the law is voiceless and powerless. It is paralyzed."

[*Id.* at 171, 96 *A.*2d 63 (quoting *State ex rel. Johnston v. Foster,* 32 *Kan.* 14, 3 *P.* 534 (Kan.1884)).]

We also emphasized the duty of a prosecutor to investigate matters within his jurisdiction:

"The duty of a prosecuting officer necessarily requires that he investigate, *i.e.,* inquire into the matter with care and accuracy, that in each case he examine the available evidence, the law and the facts, and the applicability of each to the other * * *."

[*Id.* 12 *N.J.* at 172–73, 96 *A.*2d 63 (quoting *State ex rel. McKittrick v. Wallach,* 353 *Mo.* 312, 182 *S.W.* 313 (Mo.1944)).]

As with any trial attorney, a municipal prosecutor has the duty adequately to prepare for trial. The prosecutor must select the State's witnesses and prepare and present the State's evidence in court. *State v. Prickett,* 240 *N.J.Super.* 139, 146, 572 *A.*2d 1166 (App.Div.1990). Because the State is the municipal prosecutor's client, a failure to discharge the obligations of his office is a violation of a prosecutor's professional responsibility to represent the client diligently. When a prosecutor has available relevant evidence bearing on a prosecution, and the prosecutor's failure to present that evidence in the course of trial results in acquittal, that prosecutor has not diligently discharged his or her duty to prepare and present the State's case. Furthermore, when the failure to prepare for trial and present relevant evidence prejudices the State's case, the prosecutor's deviation from that duty may be so severe as to constitute gross negligence. *Cf. Tessler and Son, Inc. v. Sonitrol Sec. Sys.,* 203 *N.J.Super* 477, 484, 497 *A.*2d 530 (App.Div.1985) (observing that gross negligence differs from negligence in degree but differs from wanton misconduct in kind).

We note respondent's testimony that municipal prosecutors frequently prepare cases immediately preceding trial, typically in routine matters in which the State's witnesses are police officers who have been notified of the trial date by the municipal-court clerk. Without condoning that practice, we acknowledge the limited pretrial preparation routinely undertaken by some municipal prosecutors. "We understand that much of the subject matter in controversy in the municipal courts is minor and, in such cases, informal practices should continue, but in the more significant cases, a more careful, thorough procedure is warranted." *State v. Holup,* 253 *N.J.Super.* 320, 326, 601 *A.*2d 777 (App.Div.1992).

Although the DRB expressed its reluctance "to indict this respondent for the municipal court system's flaws," the importance of thorough preparation in the *Weinberg* matter could not

have been lost on respondent. On June 21, 1989, the trial court had notified respondent that the trial would occur on July 19, 1989. Respondent told the DEC that he had not taken any action regarding that notice because he had believed the charges against Judge Weinberg to be routine. He became aware of the material facts in the *Weinberg* case in early July. On July 14th, both the Deputy Attorney General and the county prosecutor told respondent that he would be prosecuting the charges against Judge Weinberg. Not later than July 14, 1989, respondent knew that this was anything but a routine municipal-court prosecution. At the very least, respondent had five days to prepare for trial.

The case file, which contained a list of eyewitnesses and three sworn statements that Dr. Weinberg's vehicle had been operated without headlights prior to and at the time of the accident, was available to respondent during that five-day period. Both police officers testified before the DEC that had respondent called them or asked the dispatcher to do so, they would have appeared in municipal court on the evening of July 18, 1989. When asked before the DEC whether respondent would have had access to the file, Sergeant Harty confirmed that the file had been available to respondent.

Respondent's failure to ensure the attendance at trial of eyewitnesses severely prejudiced the State's case. In his argument on the motion for adjournment, respondent told the trial court, "It seems there are a number of other witnesses and for whatever administrative reason all the ducks were not lined up for today." Respondent testified before the DEC that when he made that statement to the trial court, he "knew generally the significance of [the witnesses'] testimony." Even armed with that knowledge, respondent failed to subpoena the witnesses or otherwise attempt to secure their participation. Respondent conceded that testimony regarding whether the lights on Dr. Weinberg's car had been operational at the time of the accident was critical to the case against Judge Weinberg.

We conclude, as did the DEC, that

[t]he factual pattern established in this matter clearly shows that respondent did little or nothing to prepare this matter for trial from the initiation of the motor vehicle charge. * * *

Now focusing on the last several days prior to the trial, beginning with the July 14, 1989 call to respondent from the Deputy Attorney General, respondent should have immediately attempted to contact [the trial court] and his adversary for an adjournment and should have immediately begun preparation of the case in the event an adjournment was not granted. Again, respondent's explanation that he was simply relying upon his feeling that [the trial court] would grant an adjournment on the morning of trial, is without merit.

Respondent's expectation that the trial court would grant an adjournment was not without foundation. We note that adjournments are routinely granted in municipal-court cases. However, this Court had assigned the case for trial to the Superior Court and the trial court had informed respondent of the trial date a month in advance. Respondent had been asked to notify the court promptly if unable to proceed on the scheduled date, but respondent took no action to secure an adjournment until the morning of trial.

A prosecutor whose only preparation for the trial of an important case occurs after he arrives in court on the date fixed for trial cannot expect lenient treatment when he discovers that [ ] he is not ready for trial.

     *       *       *       *       *       *       *       *

Postponement requests must be considered, in part, in the light of preparation efforts. If they are not, parties will have no incentive to prepare. Our system is designed with incentives which run in the other direction.

[*State v. Perkins*, 219 *N.J.Super.* 121, 126–27, 529 *A*.2d 1056 (Law Div.1987).]

Notwithstanding respondent's lack of preparation for trial and his adjournment request, without prior notice, on the date fixed for trial, the defendant's status as a member of the judiciary and the tragic events that were related to the charge before the trial court lead us inescapably to conclude that the trial court should have adjourned the trial of Judge Weinberg. Under these compelling circumstances, the prosecutor's unpreparedness and his untimely adjournment request should have been subordinated to the overriding public interest in a comprehensive and undiluted presentation of the State's proofs.

Although denial of the adjournment request may have constituted a mistaken exercise of discretion by the trial court, that

ruling does not excuse respondent's failure to prepare. Respondent knew at least five days before the assigned trial date that the defendant was a Superior Court Judge and that the charges were directly related to a pending indictment against Dr. Weinberg for death by auto. Respondent understandably may have hoped that the court would grant his adjournment request, but his failure to prepare for the possibility that the trial would proceed was utterly inexcusable.

We conclude that respondent was grossly negligent in his handling of the *Weinberg* matter. In reaching that conclusion, we do not imply that the failure of a prosecutor or any other attorney adequately to prepare for trial necessarily constitutes a violation of the *Rules of Professional Conduct*. On this record, however, we are impelled to find that respondent's failure to engage in *any* trial preparation, in the context of his responsibility to prosecute a member of the judiciary for an offense related to the death of one victim and serious injury of another, elevates the severity of respondent's breach of duty to the level of an ethical violation. Furthermore, respondent failed diligently to represent his client, the State of New Jersey. That failure to act violated *RPC* 1.1(a) and 1.3.

As we have observed frequently in other contexts, "[t]he severity of discipline to be imposed must comport with the seriousness of the ethical infractions in light of all circumstances." *In re Nigohosian*, 88 *N.J.* 308, 315, 442 *A.*2d 1007 (1982). We find no improper motivation on respondent's part. Nor do we find any affirmative interference with the criminal-justice system. *Cf. In re Weishoff*, 75 *N.J.* 326, 382 *A.*2d 632 (1978) (imposing one-year suspension on municipal prosecutor for knowing participation in improper disposition of traffic ticket). We note the DEC's conclusion that respondent admitted all of the allegations and appeared contrite and apologetic in his demeanor. Furthermore, the DRB was not satisfied by clear and convincing evidence that respondent had violated the *Rules of Professional Conduct*.

We conclude that a public reprimand is the appropriate discipline to impose on respondent. It adequately will sanction respondent for the breach of his prosecutorial duties and emphasize to the bar that lawyers serving public bodies, as well as the private bar, cannot fail to be diligent in the performance of their professional duties.

Respondent shall reimburse the Ethics Financial Committee for appropriate administrative costs, including the costs of transcripts.

*For reprimandment*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI, and STEIN—7.

*Opposed*—None.